Mr. Noteboom. All right, you may proceed. Good morning, and may it please the court. My name is Todd Noteboom, and I represent the defendant appellant State Farm Life Insurance Company. With me today at the council table is my co-counsel, Jeremy Root. Also with me here today behind the bar are counsel from State Farm, Greg Eisenreich and Terrence O'Mara. State Farm asks that the judgment entered against it by the district court be reversed, that the class be decertified, and that this court order the case dismissed. This case arises, of course, from a universal life insurance policy that was issued by State Farm back in the 1990s. Prior to first offering that policy to Mr. Vogt or to any other member of the sets of rates. The first was a set of maximum rates, rates that would be listed in the policy, rates that it would be expressly authorized to charge, and rates that it would promise could never be exceeded. The second set of rates was a lower schedule of rates, rates that State Farm under its policy would have the discretion or the option to charge. State Farm made no promises in the policy about how those rates would be initially developed. But they were developed in accordance with actuarial standards of practice and then sorted by three and only three variables. The age of the policyholder, sex of the policyholder, and the rate class of the policyholder. That's important because when Mr. Vogt walked into his farm agent's office back in 1999 to apply for life insurance, he was shown both the maximum set of rates that State Farm could charge, but was quoted a lower cost of insurance rate. And that lower cost of insurance rate was from this lower discretionary rate schedule, and it was based on his age, which at the time was 54, his sex, male, his rate class, which was described by him on his application to be standard health and non-smoking. He then went through, as any of us who have applied for life insurance do, a medical exam, an underwriting process, health issues were discovered, and he was then quoted a slightly higher rate simply because his rate class changed. It's against that simple but important backdrop that three independent legal errors by the district court on the central legal issue in appeal can be seen. First, the district court erred in holding that the language on page 10 of the policy, which describes how the rates will be assigned to each policyholder, somehow addresses how the COI rates had to be developed prior to the time the policy first issued. This case, this case involves pre-policy rate setting and not changes to rates after the issue. Second, the district court independently erred in concluding that this same language of the policy creates an exclusive list of factors that State Farm could consider in developing its COI rates again prior to the time the policy issued. And third and finally, the district court's construction of this policy language renders meaningless the provision of the policy that allows State Farm to charge a maximum rate that was higher than the rate that was charged to Mr. Vogt. Council, why should we go outside the four corners of the policy to find the components of the monthly rate? You don't need to go outside of the four corners of the policy. The four corners of the policy make clear what the maximum rates are. There's only one rate that's quoted in this policy, and it's found on page four. It starts at age 54 for Mr. Vogt, and it precedes the pace as years go on. It's clear from the language of the policy exactly what those rates are. They're organized by rate class. While there are many issues on appeal, I believe that three that I have focused on here this morning are the most fundamental to the issues before the court, and it's here that I would like to focus the remainder of my time. Only one circuit court of appeal in the country has addressed the first two legal issues that I have framed. Council, I'll interrupt you just for a minute here. My recollection is the contract interpretation issues were resolved at summary judgment. Is that correct? That's correct. When I take a look at the record here, I don't see that you've appealed the denial of summary judgment. I don't see that addressed extensively in the briefs, but I wonder if you'd address that given some of our cases that suggest that we don't have jurisdiction to discuss or to rule on an order from the district court that's not been included in the notice of appeal. Our appeal is from both the verdict itself, which embraces, of course, that summary judgment denial, and from all orders of the district court pursuant thereto. The Park Hill case, which was cited by the plaintiffs' counsel in their brief, is from a full appeal of a verdict and all orders relating thereto. We believe the issues that arose and arise from the court's denial of summary judgment are fully ripened before the court. Again, only one circuit court of appeal in the country, only one, has addressed the first two legal issues in this case, and as to each of them, has squarely rejected Plaintiff Appellee's position. That, of course, again, is the Seventh Circuit in Norham and Tao. The life insurance policies, importantly, in Norham and Tao, are very similar to the policy that's at issue here. Each involved COI rates that had been developed long before the policy issued. Each involved COI rates, cost of insurance rates, that were developed using factors that were not specified in the policy. And each was then sorted in accordance with age, rate, rate class, and sex in accordance with those policies' language. So as to the first issue, the first issue here, that the sentence in the policy addressing monthly cost of insurance rates serves to tell a policyholder factors that are unique to them that will inform their COI rate, the Seventh Circuit is the only court in the country, not just the only circuit court, the only court in the country that has addressed this issue, and it speaks to it quite forcefully. Critically for our analysis, the court held, is the fact that the characteristics that are enumerated in the policy, age, sex, and rate class, are precisely the characteristics that demonstrate how a COI rate is likely to vary from one policyholder to the next. In other words, the policy spells out those factors so that a policyholder will have a sense of the factors that are unique to them that will determine their ultimate rate. None of the cases, not a single case cited by the plaintiffs in this record addresses that issue. Not the Southern District of New York in Fleisher, not the Central District of California in Dean, and not the Northern District of California in Valley. Counsel, the language in the policy in the NORM case out of the Seventh Circuit is significantly different than the policy here. In NORM, the policy says the rates will be but they will never be more than the guaranteed rates, whereas this policy says such rates can be adjusted for projected changes in mortality but cannot exceed the maximum rate. That's very different language. Yeah, the language that you're quoting from our policy, Your Honor, this is a very good question and it's a very important issue, deals not with how rates will be set prior to the time the policy issues. The language, Your Honor, just quoted comes from a sentence that is several down from the at-issue sentence in this case that governs how changes may be made in the future to rates. In other words, if an insured walks into a State Farm agent's office, there has to be some schedule of rates that already exists such that we can assign a rate to them looking at their age, sex, and rate class. That's precisely the issue that was raised in the NORM and TAO cases and what the court said is it's simply a mechanism by which an insurance company assigns a rate to a policyholder. It's really no different than, for example, a shipping company. Any of us who've walked into a UPS store or a Federal Express store to mail a package understands that the way that is priced will be based on the size of the package, the weight of the package, and the destination. We all understand, of course, that that shipping store will have had to make determinations long before we walked in about how to set its prices. What does the airplanes cost? What do we have to pilots? What does gasoline cost? All of those things go into developing the underlying rates, but when you walk into the store and the Seventh Circuit talks about this in the TAO case, the question becomes, how are we assigning a rate to you in the first instance? A fundamentally different question, and this is where the cases fundamentally divide, is thereafter. If a change is going to be made to that rate, under what circumstance? In this case, in this case, all State Farm ever did was lower its COI rates, and it did that in 2002. This is not a case that involves a change in rates thereafter. On the undisputed record here, it is clear that what State Farm did was assign a rate to Mr. Vogt based on his age, sex, and rate class, consistent with the plain language of the policy on that basis alone. The decision of the district court should be reversed, and the case against State Farm dismissed. But even if this court were to analyze the term, whether the term based on, as used in that ad issue sentence, somehow obligates State Farm to calculate its underlying rates with reference to age, sex, and rate class, the answer is still no. Again, the only circuit court in the country that has addressed that question, the Seventh Circuit, has squarely rejected the notion that the term based on, at least in this context, denotes exclusivity. Consistent with Missouri law, the Seventh Circuit consulted dictionaries and looked to the plain and ordinary use of that term as defined in a dictionary. It's defined as a main ingredient or a supporting ingredient. Other dictionaries that have been cited to this court tell us that it's defined as a foundation, which of course fits well here. State Farm's COI rates were developed starting with its own internal mortality tables, and from there, they were sorted into tobacco and non-tobacco, and then pooled such that all policyholders of a particular age would pay the same rate regardless of how long the policy had been enforced. And from there, profits and expenses were then added. But the foundation of the rates, the starting point of the rates, was State Farm's mortality table. The district court here ignored Missouri law, which obligates the court to look to dictionary definitions in trying to ascertain plain meaning. The court ignored dictionaries altogether. Instead, it points to the Seabolt case from this court and from the Mendenhall case from the Missouri Supreme Court, purportedly holding that the phrase based on connotes an exclusive list of factors. Neither case addresses the term at all. Neither case looks to dictionary definitions for that term, and neither case we submit is remotely helpful to the court's decision here. The district court also suggests that other COI cases have addressed similar policy length and concluded that the phrase based on somehow suggests an exclusive list. That isn't correct either. The Southern District of New York in Fleischer and the Southern District of Iowa in Jeans, to your question, Judge Grass, were looking at the question of changes that happen in rates after the policy issues, fundamentally different cases from the case at bar. Those provisions don't address, just as the policy language here doesn't address, how rates were developed prior to policy issuance, nor do they provide a mechanism for assigning rates to a policyholder thereafter. Instead, they address the question of after developing the rates and assigning them in the first instance to a policyholder, under what circumstance may they change. In many of these cases, the changes are tied to mortality. And so if a policyholder in an environment where mortality is improving, people are living longer, are raising their cost of insurance rates. The question presented in these cases is, how can you do that when changes in those policies are tied to mortality? Those are the problems in those cases. Not a one of them addresses what happens in setting rates initially, before a policyholder walks into their agent's office, before someone walks into a shipping store to ship a package, to go back to the Seventh Circuit's analogy. There's only one case cited by the district court and by plaintiffs that addresses that, and that's the Central District of California's decision in Dean. And all I will say on that case, in the interest of time, is that it's a bit of a curious holding because the court there, as Missouri law compels this court to do, starts with a dictionary definition. It adopts the dictionary definition, a non-exclusive term. It agrees that it's a foundation. It points to other courts, the Montana Supreme Court, the Washington Supreme Court, each of which said it's a non-exclusive term. And then the court simply jumps to a conclusion that there could be other definitions and decides the policy there is ambiguous. It's inconsistent with California law, as we've noted in our brief, but at bottom, to the extent that that case is helpful here at all, I believe it's helpful because the court goes to dictionaries and concludes that the only logical definition of that is a non-exclusive one. We of course also cite in our briefs, because this isn't limited just to the Seventh Circuit and differentiating other cases, the U.S. Supreme Court's recent decisions last year in the Coons and Hughes cases. I won't spend time unpacking those here in the interest of time, but in those cases, the Supreme Court consults with a dictionary, refers to Black's Law Dictionary, and while those cases are factually dissimilar, the analysis followed by the Supreme Court is very instructive of the issue here. The court concludes that the term is not exclusive, again with reference to Black's Law Dictionary. In light of the persuasive authority from the U.S. Supreme Court and the Seventh Circuit Court of Appeals, the nearly universal dictionary definitions reflected in court's opinions and cited by the parties in their brief, and the distinguishable authority from other courts that have addressed COI cases in fundamentally different contexts, State Farm submits that the district court erred in holding that the phrase based on, as used in State Farm's policy, reflected in some way an exclusive list of factors. Finally, and I'll be very brief on this point and reserve the remainder of my time for rebuttal, is the other fundamental problem, and it's an independent problem with what the district court did, and that was to deny State Farm its contractual right to charge maximum rates by finding that the policy somehow imposes a durational requirement in terms of how we specify our rates. That holding we submit is particularly strange. There is nothing in the language of State Farm's policy on page 10 or anywhere else that creates a requirement that State Farm had to differentiate its rates based on the amount of time a policy had been in place. All it does is refer to the age of the policy holder and use other terms so that you can determine on the policy anniversary and someone's birthday, which may be at different points in a year, how we are calculating age. If the anniversary of a policy is in January and the insured's birthday is in August, a question could arise as to how we calculate what their age is during the course of that year. State Farm's policy answers that question and says we look to the policy anniversary, the age on that date, and that will be their age for the rest of the year. And if the court wants to look at other policies where duration is there, I would refer the court to the Dean case from the Central District of California. That policy, and it's quoted in the opinion, has a durational requirement. It's very different than the language in State Farm's policy. In that case, policy explicitly says the length of time the policy has been in force. We won't find any of that language. So for that independent reason, we believe the district court erred and the lower court's holding should be reversed. Unless there are any further questions, thank you. Thank you, counsel. You may proceed. May it please the court. The crux of this appeal is whether State Farm, under controlling Missouri law, is allowed to take a rate that it determined using four factors that it listed in the contract and then increase that rate using eight factors that it did not put in the contract, did not identify to the policyholder, and was never disclosed policy. Counsel, the opposing counsel says this case has nothing to do with rate increases, it only has to do with the base rate. Why is that wrong? It's not wrong that this case has to do with the initial rate setting. What's wrong is that that distinction is one of relevance. The rate increase cases, if you look at them, what they were doing were looking at what was the meaning of based on. And just like here, the insurer was coming in and saying, even though this policy said we can adjust rates based on mortality expectations, the insurance companies wanted to say, well, we can consider other factors in adjusting rates as well, because based on does not imply exclusivity. Adjusting or initial rate? Adjusting. They wanted to say that they could adjust rates because of factors that were not listed in the policy. I thought they just told me that this only had to do with the initial rate, not the adjustments. Today's case only has to do with the initial rate. The other cases had to do with at a later time they wanted to change the rates. But I do want to be clear that these rates are not disclosed to policyholders at any time prior. There's no evidence in the record that these rates are ever disclosed to policyholders at any time. What's disclosed to policyholders is what their charge is going to be. But an ordinary person is not able to look at the charge and figure out what cost of insurance rate that State Farm set, nor are they able to know that of the pricing of the policy. And the result of that was that 24,000 Missouri policyholders were overcharged under the terms of this policy. At times, I think it's important to note, at times the amount of the cost of insurance charge that was attributable to these unlisted factors was more than 50 percent of the total cost of insurance charge. We cite in our brief schedule that shows for Mr. Vogt, his charge at one point, the first policy year, 70 percent of the cost of insurance was determined not from the four mortality factors that they said the charge was going to be based on, but for things they had never told the policyholder about. The result of these overcharges is that it drains the savings account that is part of these life insurance policies and puts the policyholder at risk of losing the death benefit that they bought for their family. Counsel, where would the company's profit come from if they couldn't include that in their initial cost of insurance? I think that's a really good question because that is really why we think one of, but the fundamental reason why the norm decision was was mistaken and should not be followed under Missouri law here. Because norm really rests on this idea that an ordinary person coming in to look at this policy would think State Farm has to earn a profit and the profit has to come in the cost of insurance charge. The district court disagreed and what the district court here said was yes, an insured will expect State Farm to make a profit, but even though it expects it to make a profit, nothing in the policy tells them that's going to come in the cost of insurance charge. Importantly, there are five different places, five different charges in this policy that are separate and distinct. There's the cost of insurance charge, there's the surrender charge, there is the part of the policy where you pay State Farm eight percent if you need to take out a loan on your policy account, there's the expense charge that's sixty dollars a year that's taken out automatically, and then on top of all those charges, State Farm takes five percent off the top of every premium that is paid into the policy. That's before the cost of insurance charge is deducted. That's before the surrender charge is deducted or the expense charge or any of these other things. So a reasonable policyholder could look at that. You can't tell me that a reasonable policyholder would look at that and necessarily assume that the profit is coming out of the cost of insurance charge, and that's what the district court got correct here. But on top of all that, even if those charges were not enough for a reasonable policyholder to believe that State Farm is profiting from this policy, State Farm can earn money on the interest spread. A policyholder deposits money into the account and they get back an interest rate. Ordinary people understand that when you get a, for example, a no-fee checking or savings account, the bank's not losing money on the fact that they're offering that account to you. They're taking your money, they're investing it in other places, and they're earning higher interest or they're hoping to earn higher interest than what you earned. And that's part of the bargain, and that's part of the way all of these policies make money. The supplemental appendix that we've moved for leave to file, which is a trial exhibit that was admitted at the trial here, we think that conclusively shows that even State Farm understood they're earning profit on other parts of this policy besides the cost of insurance charge. There were times when they set the cost of insurance charge below a mortality rate for competitive business reasons because they wanted to sell more of these policies and make them more attractive in certain years, but they understood they did that precisely because they understood profit was coming out of different places. I do want to go back and make sure that we, because we didn't hear about it in Mr. Notenboom's argument, but I want to make sure everyone understands what the controlling law here is. The job of this court, under principles of federalism and ERIE, is not to predict how the Seventh Circuit might construe this policy. The job is to predict how the Missouri Supreme Court would construe this policy. That is the court's law. It's clear that Missouri would not allow State Farm to charge policyholders for things that weren't disclosed in the policy and they're outside the four corners of the policy. Under Missouri law, the guiding principle is to look at how an ordinary person of average intelligence would understand this policy when they're purchasing insurance. It's important for State Farm to prove that their interpretation of the policy is reasonable. They have to prove not only that their interpretation is better than the district court's interpretation. They have to prove that the district court's interpretation here is unreasonable and that's a high burden to meet. We think there are at least three reasons why the district court's interpretation is correct and let me first address the issue of policy language and the dictionary definitions that they cite. The policy provision here, and Mr. Nodaboom has argued that, I think he said the policy expressly authorizes them to charge up to the maximum rates. There is nothing in this policy that says they are expressly charged, expressly permitted to charge up to the maximum rates. You look at the addendum, page 126 has the relevant policy language. What it says about the maximum rates is this. Such rates can be adjusted for projected changes in mortality. That's what he referred to as if we decide to raise the rates, we can do that sometime during the life of the policy. They'll be adjusted for projected changes in mortality but cannot exceed the maximum cost of insurance rates. What that means is if mortality worsens, if for some reason a particular class of insurance, if their mortality gets worse during the 20 years they own this changes in projected future mortality, but what they're not allowed to do is to exceed the table of maximum. Nowhere does the policy say, and this would be a different case if the policy said, and State Farm had written into the policy, we will set cost of insurance rates, we have the discretion to set them at any level, but they won't exceed the maximum. Or they could have said we may charge up to the maximum at any level we want. They didn't put any of that in the policy. And Missouri law is clear that if the language of the policy itself is uncertain, if it's duplicitous, if it's indistinct, the court has to find that it is ambiguous. And if it's ambiguous, it has to be construed against State Farm. Let's discuss that. Opposing counsel says that those cases are all distinguishable. What's your response to that in terms of whether there is a diversity of opinions out there such that this is ambiguous? Well, Mr. Nodaboom has said that certain cases are distinguishable because they involved rate increases. We would submit that that is not a relevant distinguishing fact because in each of those cases, what the court was doing was exactly as State Farm is arguing here, is to say we don't have permission in the policy to increase the based using additional factors. But what the State Farm or what the other insurance companies were arguing was that based on a loan, because it only requires something to be the starting point of the foundation, allowed them to use unlisted factors. And the courts rejected that reasoning. For example, in the Allman case, which we cite in our brief, and the defendant here was State Farm at that time was arguing against an insured who said that State Farm should have included tobacco use, a mortality factor, in setting his rate. It was a juvenile policy and the juvenile did not use tobacco and he thought he should get a lower rate for that. And this is what the court said about the based on clause in that case. By the plain language of the policies, it is clear that the insured's age and sex, those were the only two listed factors, are the only mortality factors relevant to the rate. That was at State Farm's urging when it was to their benefit to argue that the listed factors were exclusive. And now they're coming in and arguing that the listed factors are non-exclusive. That's an example of why the rule against ambiguities exists here. Because if a insurance company is allowed to use indistinct language when they write a policy and not be clear, then they can take contrary positions depending on how it benefits them. And Missouri law is clear that you're not permitted to do that. I think it's important here that if State Farm had wanted to do what it actually did here, it could have easily written into the policy that the rates would be based on including but not limited to age, sex, and rating class. But it didn't do that. It could have said that the rates were going to be based on age, sex, and rating class and the other eight factors like interest and persistency and asset share that it has admitted that it considered. It didn't do that either. These would have been very easy ways for State Farm to obtain the permission from these policyholders to do what it says now that it has done. We know that State Farm did calculate mortality rates using the four listed factors. Those were the rates that it submitted to the New Jersey regulators when they asked what are your mortality assumptions. And the record is clear here that that's the same way they priced the policies here in Missouri, even though it was given to the New Jersey regulators. But State Farm didn't stop with those rates. Instead it used these eight unlisted factors to increase them. Because they're unable to point to express consent in the policy, nowhere did they say including but not limited to, nowhere did they list the factors, their entire argument hinges on a reasonable and sure understanding that by using the phrase based on, what they really meant was sorted by or organized by. The word sorted by don't appear anywhere in the policy. Even their definitions of based on don't show that base means sort or arrange or organize. And the decisions that have said well, that's what they really meant, that's not a permissible way to read the policy. You can't substitute the words you wanted to use for the words you did use. The district court did not ignore dictionary definitions here. In fact, what the district court said was frequently based on is used to identify a specific thing from which something else is developed. It's in the addendum at page 43. That's entirely consistent with how Black's Law dictionary defines the verb base and says that base is typically used with the word on. To use something as the thing from which something else is developed. Likewise, the American Heritage Dictionary that we cite in our brief says that base can mean to find a basis for establish. Where establish is to generate something. State Farm did generate mortality rates using the four listed factors. Then it went a step further and did something it never told anyone it was going to do when it wrote the policy and it increased them. Now State Farm's contention is we had to do something else because you can't get to a mortality rate from the four factors alone. And we understand that. But what a reasonable person would expect when making a calculation is that there is a formula. And then what State Farm has done is they've told you what the elements of the formula are and then they apply the formula. As the Fleischer Court said, when you calculate a baseball player's batting average, it's based on the number of hits and the number of times it bat. Those are the only two factors, but then you have to apply the formula for calculating an average. When you want to calculate the velocity of something, it's based on distance and speed. Those are the only two factors, but you have to use the formula to get there. This is exactly the same. State Farm calculated a mortality rate using this mortality formula. Now that's a more complex mathematical formula than an average or velocity, but the principle holds true. And an ordinary person could read this as saying that based on means the factors that are going to be included with the formula. That's what the Dean Court found. And the Dean Court said exactly that in that that's a plausible and reasonable meaning of the policy here. I think it's important to note that the shipping analogy, I've never gone into a FedEx store or a UPS store where they've told me that the price is going to be based on these different factors. They just tell me what the price is. And that's quite different here because no one told Mr. Vogt or the other policyholders how the rate was going to be calculated other than what's in the policy. I think policy as a whole interpretation is important, obviously, and we believe that supports our interpretation because these charges are taken automatically. This is not like State Farm sends an invoice or asks for a premium and then the money comes out. The money comes out of your account and if the money is not, there's not enough money in your lapse period. State Farm obtained permission to take these charges once when the policy was entered into. That permission is supposed to last a lifetime. It's certainly reasonable for an ordinary person to look at that and say, you're going to tell me everything you're doing to take money out of my account. You're going to list all of the factors. You're not expecting me to imply solely from the words based on that there's going to be all these factors that might double the charge you're taking out of my account in some years in a way that I can't even figure that out or know about it. And if someone did find out about it 10, 20 years later, at that point, your only option is to surrender your policy and lose the death benefit at an age when you're unlikely to be able to get insurance for your family. Counsel, help me understand this just a little bit more. The policy says rates could only be adjusted for projected changes in mortality. So what other changes would there be over the lifetime of the policy? Well, the changes that could happen is, for example, if 10 years down the line State Farm looks at this and they say, people are keeping these policies for a longer period of time. Let me back up. One of the important things about these policies is although they're characterized as permanent life insurance, most of them are surrendered before someone dies because the cost of the policy becomes too high for the policyholder to maintain them. If State Farm did not predict that sufficiently, what they would say is that we can adjust the rate because we're losing money on the policies, or they may adjust it because interest rates have gone down, or they may adjust it because their expenses have gone up. How does it fall within the category of projected changes in mortality? We don't think that would be permitted by the policy, and that's why the policy tells the policyholder the only reason these rates will only be adjusted for changes with projected mortality, and we contend that means nothing else. But the policy also says that the rates for each year are based on the insurer's age, sex, and rating class, and we contend that is violated when State Farm considers eight other factors to more than double the policy at times. I do want to correct one thing that Mr. Notaboom said. He said that we didn't have any other federal court case that interpreted an initial rate-setting case. That disregards the fact that we actually have a case we submitted in a 28-J letter on August 21st, the Bally v. State Farm case. Judge Charles Breyer in California interpreted this same policy applied to California policyholders, the exact same language here, the exact same claims here. It was challenging initial rate-setting. He looked at Judge Lowry's opinion. He did an independent, his own analysis, and he concluded that the policy does not unambiguously permit State Farm to use factors that are not in the four corners of the policy to set the rates. So that is the most analogous case that we have. Counsel, could you briefly address damages and the applicable interest rate? And specifically, I'd like to know whether the damages are readily ascertainable so as to be liquidated under Missouri law. So, yes. The answer is yes, we believe it is readily ascertainable, and here's why. There was no dispute that State Farm could have and that the experts did perform their job. It was simply as simple as taking what we said were the correct mortality rates and substituting those in for the rates that State Farm charged and having a computer run that through the millions of lines of transactions that happened in these policies over the years. There was a dispute about the underlying factual assumptions at trial about how we got which rates were the right rates. But in terms of determining the amount of the damages, it was mathematical. This wasn't a case, for example, where you're talking about lost profits or you're talking about emotional distress or, you know, the types of damages that are more subjective and you don't get interest on them because how can the defendant know that that's what they need to pay? I see my is up. May I finish the question? Yes, you may proceed. And so that's why we believe that the damages are readily ascertainable. With respect to your second part of your question on the cross appeal, the issue principally is that the district court said that the experts awarded interest and she wasn't going to apply Missouri statutory law to give further interest. However, what she failed to address, and I think she just overlooked it, is the fact that once the policy was surrendered, Mr. Vogt surrendered his policy in 2013. The expert didn't calculate interest for that because the policy account no longer existed. He took his policy out. He didn't get any of the statutory interest he's entitled to under Missouri law from the time he surrendered the policy to the time of judgment. And we think that was just a clear error. We would ask that the court affirm everything about this case and remand with the limited instruction to award pre-judgment interest. Thank you very much. Thank you very much. About two and a half minutes. Thank you. Council made a number of points. Let me hit just a few. One of the points council said is that Missouri law controls. At least on that narrow issue we agree. Council talked about that being a difference from NORM and TAU. What council didn't say is that there's fundamentally no difference between underlying contract construction principles in Illinois, which is where NORM came out of, or Wisconsin, which is where TAU came out of. We submit that a person of average intelligence would understand what the policy on its face makes clear. Council, let me ask you a hypothetical in that regard. There's a lot of discussion in this case about a cake recipe. Sure. It seems to me maybe a better analogy would be an auto repair shop. So you take your car in and they tell you your bill will be based on parts of labor. Based on parts of labor. Can they charge you for their lunch? You know, I'd have to, I don't know the answer to that, your honor. But isn't that, that's the same words we have in the policy. Sure. And I, what I would, what I would say is in some contexts the term based on could connote exclusivity. And we're not suggesting otherwise. What we're suggesting is where it's used here, it simply does not. It simply does not. There's no suggestion here. And if you go to dictionary definitions, and I didn't hear anything otherwise from council this morning, which of course is what Missouri law compels this court to do, there isn't any dictionary definition I've seen that uses the term exclusive. There's nothing, it just doesn't find any support in the dictionaries, which is where Missouri law sends us. You know, council, we've heard, we've heard almost 40 minutes of argument here about this, about these terms. But no one's talking about the statement that the district court made that at a minimum there's ambiguity. We've heard, we've heard really good argument from both sides here. And it's been briefed extensively with different, different viewpoints. Isn't that a pretty good indicator that at the very least we have ambiguity here? No, it isn't. Missouri law has been clear for decades. The Missouri Supreme Court has made clear that ambiguity doesn't arise from the fact that different courts have reached different conclusions. Missouri law compels the court to go to dictionary definitions, which are universally clear that this term does not mean an exclusive term. What the district court ignores, what the district court ignores, other than in footnote one in two sentences, is that the first issue that to this court that only Noram and Tao address, which is the only thing that that clause in the contract tells us is how a rate will be applied to a particular policy. When they walk into a state, I see my time is up. May I finish? When a policyholder like Mr. Vogt walks in to a state farm office, the rates have already been set. That language in the policy simply is a mechanism to tell a policyholder how a rate will be assigned to them. That's exactly what State Farm did here. It was based on Mr. Vogt's age, 54, his sex, male, and his rating class. Thank you. Counsel, before you conclude, we have this motion to file a supplemental appendix, and the motion was made to response and reply. One of the issues in those pleadings seemed to relate to uncertainty as to how that additional document was going to be used in argument this morning. Now, you've heard the argument. Is there still objection to the motion? We do object to the motion because we think it reflects a new argument that wasn't raised by counsel below. It wasn't included in the appendix below, of course, which is why the issue is before the court. We think that if this is going to be allowed, as we said in our briefing, it would have to be the entire document, but based on a clear law from the 8th Circuit where something is brand new and on the eve of argument, there's no basis here for having it admitted. We also don't think it bears much on the issues that are before us. Thank you. Thank you very much. All right, thank you, counsel. Case has been well argued this morning. Thank you for your arguments. We'll take the case under advisement. You may stand aside.